UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
PAULINE FRANCIS,                                    :
                                                    :
                        Plaintiff,                  :        **OPINION AND ORDER**
                                                    :        13-cv-2813 (DLI)(MDG)
                                                    :
            -against-                               :
                                                    :
                                                    :
WYCKOFF HEIGHTS MEDICAL                             :
CENTER and BETTY O'HAGAN,                           :
                                                    :
                        Defendants.                 :
-------------------------------------------------------- x

**DORA L. IRIZARRY, U.S. District Judge:**

After filing charges of disability discrimination with the United States Equal
Employment Opportunity Commission ("EEOC"), Plaintiff Pauline Francis ("Plaintiff")
commenced the instant action against her former employer, Wyckoff Heights Medical Center
("Wyckoff" or the "Hospital"), and one of her former supervisors, Betty O'Hagan ("Ms.
O'Hagan") (collectively, "Defendants"). Plaintiff alleges that Defendants discriminated against
her on the basis of disability, and failed to accommodate her disability, in violation of the
Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. §§ 12101 *et seq.*, the New
York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 *et seq.*, and the New York
City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101 *et seq.*[1] (*See* Complaint
("Compl.") ¶¶ 32-54, Dkt. Entry No. 1.) Pursuant to Rule 56 of the Federal Rules of Civil
Procedure, Defendants move for summary judgment dismissing this action in its entirety. (*See*
Defs.' Mem. In Supp. of Mot. For Summ. Judgment. ("Defs.' Mem."), Dkt. Entry No. 46-83.)
Plaintiff opposes. (*See* Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. Judgment ("Pl.'s Opp'n"),

---

[1] Ms. O'Hagan is named only in the Second and Third Counts of the Complaint, alleging liability under the
NYSHRL and NYCHRL. (*See* Compl. ¶¶ 45, 52.)

Dkt. Entry No. 47.)  Also before the Court is Defendants' motion to strike the Declaration of

Neil Steinkamp, dated January 15, 2015 ("Steinkamp Decl."), Dkt. Entry No. 47-79, which

Plaintiff opposes.  (*See* Dkt. Entries No. 43 and 45.)  For the reasons set forth below,

Defendants' motion for summary judgment is granted to the extent that the Court dismisses

Plaintiff's ADA claims, and declines to exercise supplemental jurisdiction over Plaintiff's

NYSHRL and NYCHRL claims.  Defendants' motion to strike is denied as moot.

## BACKGROUND[2]

### I.      The Parties and Relevant Non-Parties

Plaintiff is a survivor of breast cancer.  She was stricken with the disease and treated for

it during the time she was employed at Wyckoff, a not-for-profit teaching Hospital in Brooklyn,

New York.  Plaintiff began her employment at Wyckoff in 1994, when she was hired to work in

the housekeeping department.  (Def.s' Local Rule 56.1 Statement of Material Facts ("Defs.'

56.1") ¶ 1, Dkt. Entry No. 46-82; Pl.'s Local Rule 56.1 Response to Def.s' Statement of Material

Facts ("Pl.'s 56.1 Resp.") ¶ 1, Dkt Entry No. 47-1.)  In 2002, Plaintiff became a nursing

technician in Wyckoff's emergency department, a position re-designated in 2010 as an

Emergency Department Technician ("EDT").  (Defs.' 56.1 ¶ 2; Pl.'s 56.1 Resp. ¶ 2.)  Plaintiff

was assigned to the night shift, which ran from 11 P.M until 7 A.M., and worked in that role until

her employment was terminated on July 15, 2011.  (Defs.' 56.1 ¶¶ 1-3; Pl.'s 56.1 Resp. ¶¶ 1-3.)

As an EDT, Plaintiff's routine responsibilities included drawing blood, checking patient

vital signs and blood glucose, transporting patients around the hospital, performing CPR when

necessary, monitoring psychiatric patients, and maintaining documentation in electronic medical

records.  (Defs.' 56.1 ¶ 67; Pl.'s 56.1 Resp. ¶ 67.)  An EDT was expected to be able to perform

these functions in emergency situations, as the Hospital often treated patients suffering from

---

[2] The following facts are undisputed unless otherwise noted.

heart attacks, strokes, gunshot wounds, and other traumatic, life-threatening injuries.  (Defs.'
56.1 ¶ 69; Pl.'s 56.1 Resp. ¶ 69.)   Dependent on the day and patient volume, Wyckoff's
emergency department would have anywhere from four to five, and sometimes six, EDTs on
staff during a typical overnight shift.  (Defs.' 56.1 ¶ 71; Pl.'s 56.1 Resp. ¶ 71.)

For some duration prior to 2009, Plaintiff was supervised by an Assistant Patient Care
Manager in the emergency department named Digna Ignacio ("Ms. Ignacio").  (Declaration of
Digna Ignacio, dated January 14, 2015 ("Ignacio Decl.") ¶¶ 1-2, Dkt. Entry No. 47-77.)   In
September 2009, Ms. O'Hagan was appointed Director of Nursing in the emergency department
and replaced Ms. Ignacio as Plaintiff's supervisor.  (Defs.' 56.1 ¶ 13; Pl.'s 56.1 Resp. ¶ 13.)  As
Director, Ms. O'Hagan managed daily operations in the emergency department, which included
overseeing EDTs and other emergency department personnel.  (Defs.' 56.1 ¶¶ 13-15; Pl.'s 56.1
Resp. ¶¶ 13-15.)  Certain aspects of personnel management also were overseen by Joseph Foti
("Mr. Foti"), the Labor Relations Manager in Wyckoff's Human Resources Department
beginning in October 2010.  (Declaration of Joseph Foti, dated Dec. 5, 2014 ("Foti Decl.") ¶ 1,
Dkt Entry No. 46-74.)

## II.    Wyckoff's Policies

As a part of her job, Ms. O'Hagan enforced Hospital policies in order to ensure
departmental finances and a high level of patient care.  (Defs.' 56.1 ¶¶ 14-15; Pl.'s 56.1 Resp. ¶¶
14-15.)  Mr. Foti also was involved in advising on and administering Hospital policies.  (Defs.'
56.1 ¶¶ 19-21; Pl.'s 56.1 Resp. ¶¶ 19-21.)  Such policies included, among others, an Employee
Attendance Policy ("Attendance Policy") and a Policy on Employee Lateness or Early Departure
("Time Policy").  (Defs.' 56.1 ¶¶ 14-15; Pl.'s 56.1 Resp. ¶ 14-15.)

The Attendance Policy required Hospital employees "to maintain a high standard of

attendance at all times." (Ex. 17 to the Declaration of Barbara E. Hoey, dated Dec. 8, 2014 ("Hoey Decl."), Dkt. Entry No. 46-18.) Under the policy, employees were subject to progressive discipline for "excessive absenteeism," defined as "any chronic, patterned or frequent absence." (*Id.*) The first instance of excessive absenteeism could result in a warning; the second instance, if within 12 months, a final warning/suspension; and the third instance, if within 12 months, termination. (*Id.*) In addition, the Attendance Policy required any employee not reporting for work to call a supervisor to explain the absence, or else face disciplinary action. (*Id.*) Under Wyckoff's Time Policy, Hospital employees were required to be at work at their scheduled start time and to remain there through the end of their respective shift. (Ex. 18 to the Hoey Decl., Dkt. Entry No. 46-19.) Similar to the Attendance Policy, the Time Policy imposed progressive discipline for incidents of "excessive lateness," defined as three or more instances of unexcused lateness in a given month, or a single instance of lateness in excess of 30 minutes. (*Id.*) After four incidents of excessive lateness within a calendar year, the policy called for termination of the non-compliant employee. (*Id.*)

Wyckoff's Employee Handbook, distributed to all employees including Plaintiff, set forth standards for employee attendance and timeliness consistent with those in the Attendance and Time Policies. (Defs.' 56.1 ¶¶ 50-58; Pl.'s 56.1 Resp. ¶¶ 50-58; *see also* Ex. 16 to the Hoey Decl., Dkt. Entry No. 46-17.) In addition to the above policies, Wyckoff also maintained a general disciplinary policy that consisted of four steps: (1) a warning; (2) a final written warning; (3) suspension; and (4) termination. (Defs.' 56.1 ¶¶ 50-58; Pl.'s 56.1 Resp. ¶¶ 50-58.) This progressive scale of discipline was mandated under the collective bargaining agreement maintained with Wyckoff by Plaintiff's union, 1199 SEIU. (Defs.' 56.1 ¶¶ 4, 62; Pl.'s 56.1 Resp. ¶¶ 4, 62.)

Plaintiff does not deny that she received copies of the above policies and, as a general matter, that they were applicable to her as a Hospital employee. (*See, e.g.,* Defs.' 56.1 ¶¶ 55-58; Pl.'s 56.1 Resp. ¶¶ 55-58.) Nevertheless, Plaintiff maintains that she was subjected to discipline under these policies with more frequency and severity than other Hospital employees. (*See* Defs.' 56.1 ¶ 61; Pl.'s 56.1 Resp. ¶ 61.) In particular, Plaintiff alleges that Ms. O'Hagan had the discretion to make adjustments or exceptions to these policies on a case-by-case basis, but declined to do so in her case. (*See* Defs.' 56.1 ¶¶ 45-48; Pl.'s 56.1 Resp. ¶¶ 45-48.)

In addition, Wyckoff represents that if an employee were to disclose a disability, it would take that disability into account in accordance with an ADA policy that it maintains before imposing any discipline. (Defs.' 56.1 ¶ 49; Pl.'s 56.1 Resp. ¶ 49; *see also* Foti Decl. ¶ 8.) Thus, in the event an employee with a known disability violated the attendance requirements, Wyckoff's policy purportedly was to consider whether the disability caused the violation, and if so, whether an accommodation was required. (Defs.' 56.1 ¶ 49; Pl.'s 56.1 Resp. ¶ 49.) Despite that policy, Plaintiff alleges that Defendants did not consider her disability or offer any accommodation when disciplining and ultimately terminating her in 2011. (*Id.*)

## III.   Plaintiff's Claimed Disability

In 2002, Plaintiff was diagnosed with breast cancer and underwent surgery to remove her left breast and several lymph nodes. (Def.s' 56.1 ¶ 82; Pl.'s 56.1 ¶ 82.) The surgery was successful and Plaintiff remains cancer free as of the filing of this action. (Pl.'s Local Rule 56.1 Counter-Statement of Material Facts ("Pl.'s 56.1") ¶ 5, Dkt. Entry No. 47-1; Defs.' Local Rule 56.1 Response to Pl.'s Counter-Statement of Material Facts ("Defs.' 56.1 Resp.") ¶ 5, Dkt. Entry No. 48-1.) However, as a result of her surgery, Plaintiff claims to have developed a condition known as lymphedema. (*Id.*) Lymphedema refers to swelling caused by a buildup of fluid in the

body's lymphatic system, which may result from removal of the lymph nodes. (Ex. 8 to the Declaration of Amanda H. Freyre, dated Jan. 16, 2015 ("Freyre Decl."), Dkt. Entry No. 47-10.)

Since her surgery, Plaintiff allegedly has suffered from symptoms of lymphedema that "flare up" intermittently, sometimes lasting hours but other times lasting weeks or even months. (Declaration of Pauline Francis, dated Jan. 24, 2015 ("Francis Decl.") ¶ 4, Dkt. Entry No. 47-76.) According to Plaintiff, the symptoms she experiences include "severe pain, swelling and stiffness in [her] left shoulder, chest wall, arm, wrist, hand, and fingers." (*Id.* ¶ 5.) Furthermore, when suffering from such symptoms, Plaintiff allegedly is unable to grasp, lift, push, or pull, and even has difficulty concentrating and speaking due to the pain. (*Id.*) As such, Plaintiff's duties as an EDT, which involved pushing, pulling, and heavy lifting to transport and physically manipulate patients, among other tasks, purportedly strained her and even contributed to her lymphedema symptoms. (*Id.* ¶¶ 6-7; *see also* Ex. 8 to the Freyre Decl.)

## IV.    Plaintiff's Employee Record Prior to Ms. O'Hagan's Arrival

In August 1994, shortly after Plaintiff began working in Wyckoff's housekeeping department, she was disciplined for "excessive and patterned sick calls." (Ex. 9 to the Freyre Decl., Dkt. Entry No. 47-11.) Aside from that infraction, Plaintiff was not disciplined for absenteeism at any other time prior to her cancer diagnosis in 2002. (Pl.'s 56.1 ¶ 1; Def.s' 56.1 Resp. ¶ 1.) Following her diagnosis, Wyckoff granted Plaintiff a leave of absence of approximately one year for cancer treatment and recovery. (Def.s' 56.1 ¶ 84; Pl.'s 56.1 Resp. ¶ 84.) Such leave was permitted under Hospital policy and under the collective bargaining agreement Plaintiff's union maintained with Wyckoff. (*Id.*) In November 2003, Plaintiff returned to work and was reinstated as a nurse technician in the emergency department. (Def.s' 56.1 ¶ 87; Pl.'s 56.1 Resp. ¶ 87.) Plaintiff continued to follow a medical regimen that included

seeing her oncologist and taking an oral medication called Tamoxifen, but she did not at any point receive chemotherapy. (Def.s' 56.1 ¶¶ 89-90; Pl.'s 56.1 Resp. ¶ 89-90.)

On December 9, 2003, Plaintiff received a memorandum of counseling that cited her "unsatisfactory attendance." (Ex. 28 to the Hoey Decl., Dkt. Entry No. 46-29.) Plaintiff's March 2004 performance evaluation similarly rated Plaintiff as needing improvement in the area of "[r]eports to work on time and as scheduled." (Ex. 29 to the Hoey Decl., Dky. Entry No. 46-30.) In all other categories, including those pertaining to patient care, Plaintiff either met or exceeded expected standards. (*Id.*) Her manager commented that, while Plaintiff needed to improve her "lateness," she was "excellent in her role as nurse technician." (*Id.*) Plaintiff's April 2005 performance review substantially was the same, docking her for deficient timeliness and attendance but noting her professional competence while on duty. (Ex. 30 the Hoey Decl., Dkt. Entry No. 46-31.) On August 5, 2005, Plaintiff received a written warning for her "unacceptable attendance." (Ex. 31 to the Hoey Decl., Dkt. Entry No. 46-32.) The warning indicated that Plaintiff had "24 episodes of sick usage and absence from work" between January and August 2005. (*Id.*)

Plaintiff took another approved medical absence from work between March 2006 and April 2007. (Def.s' 56.1 ¶ 95; Pl.'s 56.1 Resp. ¶ 95.) The paperwork Plaintiff submitted in connection with her leave request was signed by her general practitioner, Dr. Tawadrous, and indicated that she required treatment for cancer of the left breast and "lymphedema."[3] (Ex. 32 to the Hoey Decl., Dkt. Entry No. 46-33.) When Plaintiff returned to work in 2007, she continued to call out sick on a regular basis. On August 2, 2007, Plaintiff received a verbal warning for

---

[3] Many of the medical notes or evaluations Plaintiff submitted to Wyckoff from her doctors, dating from after 2002, identified her diagnosis as including cancer. Where this is the case, a reasonable interpretation is that Plaintiff's doctors meant to indicate that she had a history of cancer potentially relevant to diagnosis, as it is undisputed that Plaintiff has not suffered a recurrence of cancer after her 2002 surgery. (*See* Ex. 6 to the Freyre Decl., Dep. Tr. of Virendra Bharel ("Bharel Dep.") at 74:21-75:2, Dkt. Entry No. 47-8.)

"unacceptable amounts of sick calls." (Ex. 33 to the Hoey Decl., Dkt. Entry No. 46-34.) As memorialized, the warning stated that Plaintiff's unacceptable use of sick calls, which amounted to seven instances in a span of 20 shifts, "affects the staffing of the unit and is taxing on your coworkers." (*Id.*) Similarly, in September 2007, Plaintiff received a final warning for her "poor attendance" and "unacceptable amount of sick calls." (Ex. 34 to the Hoey Decl., Dkt. Entry No. 46-35.) Nevertheless, Plaintiff was not subject to further discipline until January 30, 2008, when she received a one-day unpaid suspension due to her "patterned sick usage." (Ex. 35 to the Hoey Decl., Dkt. Entry No. 46-36.)

Consistent with past reviews, Plaintiff's March 2008 performance review rated her as needing improvement in timeliness and attendance, but as meeting or exceeding expected standards in all other respects. (Ex. 37 to the Hoey Decl., Dkt. Entry No. 46-38.) Ms. Ignacio, Plaintiff's supervisor at the time, commented that Plaintiff was capable of performing her job responsibilities, but needed to improve "most especially on lateness, no show and sick calls." (*Id.*) On July 17, 2008, Plaintiff received another final warning, reprimanding her for 33 instances of sick calls between August 5 and December 31, 2007, and another 42 instances of sick calls between January 1 and July 14, 2008. (Ex. 38 to the Hoey Decl., Dkt. Entry No. 46-39.)

Plaintiff's April 2009 performance review was similar to her prior reviews, except that she actually improved her rating from "meets the standard" to "exceeds the standard" in several assessment categories. (*See* Ex. 40 to the Hoey Decl., Dkt Entry No. 46-41.) Nevertheless, Plaintiff still received the same poor marks for attendance and timeliness that she had received in the past. (*Id.*) Ms. Ignacio commented that, while Plaintiff could "perform assigned tasks and some added responsibilities," she had "been out ill for so many days." (*Id.*) On May 7, 2009,

Ms. Ignacio issued Plaintiff a final warning based upon her "tremendous amount of sick calls." (Ex. 41 to the Hoey Decl., Dkt. Entry No. 46-42.)  The warning explicitly noted that the sick calls were "due to [Plaintiff's] condition."  (*Id.*)  In her declaration, Ms. Ignacio states that she was referring to Plaintiff's "cancer and related health issues."  (Ignacio Decl. ¶ 5.)  Nevertheless, Ms. Ignacio took no further disciplinary action with respect to Plaintiff for the remainder of her tenure as Plaintiff's supervisor, which lasted until Ms. O'Hagan became Director of Nursing for the emergency department in September 2009.

## V.     Plaintiff's Employee Record Under Ms. O'Hagan

Plaintiff alleges that her frequent absences from work, allegedly caused by her lymphedema, were tolerated by Wyckoff for several years.  In fact, Ms. Ignacio states in her declaration that, despite repeatedly citing Plaintiff for absenteeism between 2007 and 2009, she did not seek to terminate Plaintiff because she "wanted to find ways to accommodate her illness."  (*Id.* ¶¶ 6-7.)  According to Plaintiff, this policy changed when Ms. O'Hagan became her supervisor and refused to accommodate her frequent sick calls.  Plaintiff believes that Ms. O'Hagan "did not like [her] because of [her] disability and was a looking for a way to get rid of [her]."  (Francis Decl. ¶ 14.)

In November 2009, shortly after Ms. O'Hagan was hired as Director, Plaintiff again went on extended medical leave.[4]  (Def.s' 56.1 ¶ 114; Pl.'s 56.1 Resp. ¶ 114.)  Plaintiff took another

---

[4]    Plaintiff's medical leave was approved on the basis of two certifications she submitted from her general practitioner, Dr. Virendra Bharel.  Both certifications indicated that Plaintiff's diagnosis was cancer of the left breast, requiring treatment by chemotherapy two times a week.  (*See* Exs. 42 and 43 to the Hoey Decl., Dkt. Entry Nos. 46-43 and 46-44.)  It is undisputed that Plaintiff never received chemotherapy, nor was she supposed to receive such treatment.  The parties sharply dispute whether Dr. Bharel's certifications, indicating otherwise, were based upon intentional misrepresentations Plaintiff made to him.  Defendants contend that they were, as Dr. Bharel testified at his deposition that Plaintiff told him she was undergoing chemotherapy.  (Bharel Dep. at 64:8-14.)  However, Dr. Bharel also states in his declaration that he believed Tamoxifen, the medication Plaintiff was prescribed after her surgery, was a type of chemotherapy drug.  (Declaration of Virendra Bharel, dated July 29, 2014 ("Bharel Decl.") ¶ 3, Dkt. Entry No. 47-75.)  According to Mr. Foti, had Wyckoff known that Plaintiff's medical certifications were false, it would have been grounds for dismissal.  (Foti Decl. ¶¶ 13-16.)

medical leave of absence from February 8, 2010 through April 27, 2010. (Def.s' 56.1 ¶ 131; Pl.'s 56.1 Resp. ¶ 131.) When Plaintiff returned to work, she continued to call out sick as she had in the past. On June 18, 2010, one of Plaintiff's superiors notified Ms. O'Hagan that she had counseled Plaintiff regarding her lateness and absenteeism, and reminded her that further infractions would result in progressive discipline. (Ex. 52 to the Hoey Decl., Dkt. Entry No. 46-52.) On December 14, 2010, Ms. O'Hagan issued Plaintiff a verbal warning for her unsatisfactory timeliness and attendance, and also issued a second verbal warning for her failure to reactivate "Med Tech" access needed to perform glucose tests on patients. (Exs. 56 and 57 to the Hoey Decl., Dkt. Entry Nos. 46-57 and 46-58.) As memorialized, the warning noted that Plaintiff's inability to perform glucose tests "impacts [emergency department] operations and potentially patient safety." (Ex. 56 to the Hoey Decl.)

In February 2011, Plaintiff requested another leave of absence. The paperwork she submitted merely indicated "medical leave" as the reason for her request. (Ex. 59 to the Hoey Decl., Dkt. Entry No. 46-60.) Upon reviewing Plaintiff's time records, Mr. Foti determined that she had not worked enough hours to qualify for leave under the Family and Medical Leave Act ("FMLA"). (*Id.*) Mr. Foti notified Plaintiff that she was not eligible for FMLA leave by letter dated March 8, 2011, which he sent to Plaintiff's address on record. (*Id.*) Plaintiff maintains that she never received Mr. Foti's letter because she no longer lived at that address in 2011, a fact that Wyckoff does not dispute.[5] (Def.s' 56.1 ¶ 159; Pl.'s 56.1 Resp. ¶ 159.) As such, Plaintiff allegedly believed her leave was approved and, therefore, stayed home without calling out sick or otherwise contacting Defendants in any way. (Def.s' 56.1 ¶ 161; Pl.'s 56.1 Resp. ¶

---

[5] Per hospital policy, Plaintiff was required to provide Wyckoff with an updated address when she moved. (Def.s' 56.1 ¶ 160; Pl.'s 56.1 Resp. ¶ 160.) Plaintiff alleges that she fulfilled this responsibility by "telling Human Resources" about her new address. (Francis Decl. ¶ 16.)

161; Pl.'s 56.1 ¶¶ 22-23; Def.s' 56.1 Resp. ¶¶ 22-23; *see also* Ex. 61 to the Hoey Decl. Dkt. Entry No. 46-62.)

When Plaintiff did not come into work, Defendants took her off the schedule from March 13 to April 9, 2011. (Def.s' 56.1 ¶ 152; Pl.'s 56.1 Resp. ¶ 152.) Nevertheless, Plaintiff came into work on March 18, 2011 to complete a class for a certification that had expired. (Def.s' 56.1 ¶ 154; Pl.'s 56.1 Resp. ¶ 154.) Plaintiff was cleared to work by the Employee Health Service, but allegedly began to suffer from an upset stomach while attending the certification class. (Def.s' 56.1 ¶ 157; Pl.'s 56.1 Resp. ¶ 157.) She attempted to inform Ms. O'Hagan of her stomach issues, but Ms. O'Hagan purportedly brushed her off and told her that "everyone is fed up of [her] and tired of [her]." (Ex. 1 to the Freyre Decl., Dep. Tr. of Pauline Francis ("Francis Dep.") at 135:20-136:1, Dkt. Entry No. 47-3.) Distraught, Plaintiff left work and did not return. (Def.s' 56.1 ¶ 157; Pl.'s 56.1 Resp. ¶ 157.) Given her clearance by the Employee Health Service, Plaintiff was placed back on the work schedule starting on April 10, 2011. She nevertheless remained at home and did not return to work until May 6, 2011. (Def.s' 56.1 ¶ 163; Pl.'s 56.1 Resp. ¶ 163; Ex. 61 to the Hoey Decl.) In total, not counting any of the days between March 13 and April 9, 2011 when Defendants took her off the schedule, Plaintiff was scheduled for 70 days of work between January 1 and May 7, 2011. (*See* Ex. 61 to the Hoey Decl.) Out of those 70 days, Plaintiff was a "No Call/No Show" for 41 days. (*Id.*)

While Defendants allege that Plaintiff did not provide any documentation to explain those absences, Plaintiff points to two notes from Dr. Bharel she submitted. (Def.s' 56.1 ¶ 162; Pl.'s 56.1 Resp. ¶ 162.) The first, covering the period from February 16 to March 17, 2011, indicated that Plaintiff was under Dr. Bharel's care for breast cancer, edema of the left arm, neuralgia, and myalgia. (Ex. 44 to the Freyre Decl., Dkt. Entry No. 47-46.) The second, covering April 5

through May 6, 2011, stated only that Plaintiff was "sick." (Ex. 67 to the Freyre Decl., Dkt. Entry No. 47-70.) During Plaintiff's absence, both her union delegate, Eloise Johnson ("Ms. Johnson"), and Ms. O'Hagan repeatedly tried to contact Plaintiff by telephone, but were unsuccessful. (Def.s' 56.1 ¶ 169; Pl.'s 56.1 Resp. ¶ 169.) Ms. Johnson testified that, when she finally spoke to Plaintiff and asked her why she did not contact anyone about her absence, Plaintiff responded that she "didn't feel like answering the telephone." (Ex. 4 to the Hoey Decl., Dep. Tr. of Eloise Johnson ("Johnson Dep.") at 87:2-8, Dkt. Entry No. 46-5.) Plaintiff denies making that statement. (Francis Dep. at 317:2-5.)

During her absence in February, March, and April 2011, despite allegedly believing she was on approved medical leave, Plaintiff worked part-time as an in-home aide for an elderly couple named Mr. and Mrs. Karton. (Def.s' 56.1 ¶ 140; Pl.'s 56.1 Resp. ¶ 140.) In fact, it is undisputed that Plaintiff began working for the Kartons in July 2010, serving regularly as their weekend aide on Saturdays and Sundays from 10:00 A.M. to 6 P.M. (Def.s' 56.1 ¶ 142; Pl.'s 56.1 Resp. ¶ 142.) While that shift did not overlap with Plaintiff's overnight shift at the Hospital, Plaintiff admits that she worked for the Kartons on certain days she called out sick to the Hospital. (*See, e.g.*, Def.s' 56.1 ¶¶ 147, 199; Pl.'s 56.1 Resp. ¶¶ 147, 199.) According to Plaintiff, she could work for the Kartons on days she was not capable of working at the Hospital because it was less physically taxing on her than her EDT duties. (Def.s' 56.1 ¶ 147; Pl.'s 56.1 Resp. ¶ 147; *see also* Francis Decl. ¶ 23.)

Plaintiff returned to work on May 6, 2011 and was cleared by the Employee Health Service. (Def.s' 56.1 ¶ 164; Pl.'s 56.1 Resp. ¶ 164.) However, based on her unapproved absence, Plaintiff received a final warning for being "absent without authorization, failing to call, and fail[ing] to comply with the hospital's leave of absence policy/process." (Ex. 11 to the Hoey

Decl., Dkt. Entry No. 46-12.) The warning noted that future non-compliance would result in progressive discipline, including suspension and termination. (*Id.*) On June 21, 2011, Ms. O'Hagan suspended Plaintiff for three days without pay for continuing to call out sick and arrive late. (Ex. 9 to the Hoey Decl., Dkt. Entry No. 46-10.) The disciplinary notice Plaintiff received indicated that she called out sick on May 27, June 9, and June 15, 2011, was late for work on four additional days during the same timespan, and failed to "swipe out" when leaving work one of those days in violation of Hospital policy. (*Id.*) The Notice further indicated that termination would result from future non-compliance. (*Id.*) However, Defendants admit that June 9, 2011 was listed as an absence in error, as Plaintiff was not scheduled to work that day. (Def.s' 56.1 ¶ 187; Pl.'s 56.1 Resp. ¶ 187.) While Defendants allege that Plaintiff never notified them of the mistake, Plaintiff testified that she told Ms. O'Hagan about the error, but she refused to do anything about it.[6] (Francis Dep. at 226:13-227:5.)

Plaintiff returned from suspension on June 25, 2011. During her shift on June 28, 2011, Plaintiff was sent to see an emergency room doctor and was diagnosed as having "bleeding" and "generalized weakness." (Def.s' 56.1 ¶ 190; Pl.'s 56.1 Resp. ¶ 190.) The doctor instructed Plaintiff to go home and rest. Plaintiff did so, failing to "swipe out" when leaving work. (Def.s' 56.1 ¶ 191; Pl.'s 56.1 Resp. ¶ 191.) Plaintiff subsequently sought treatment at New York University Hospital, where she was diagnosed with fibroids unrelated to her cancer or lymphedema. (Def.s' 56.1 ¶ 193; Pl.'s 56.1 Resp. ¶ 193.) Thereafter, Plaintiff submitted a note to Defendants from Dr. Bharel, stating that she could return to work on a "full duty no restrictions" basis on July 5, 2011. (Ex. 22 to the Hoey Decl, Dkt. Entry No. 46-23.)

Following this incident, Ms. O'Hagan emailed Mr. Foti to seek advice regarding what

---

[6] Defendants allege that, even if June 9, 2011 were excluded as an absence, Plaintiff still would have been subject to discipline under the Hospital's Attendance Policy for missing two days of scheduled work within a single month. (Def.s' 56.1 ¶ 188; Pl.'s 56.1 Resp. ¶ 188.)

action to take with respect to Plaintiff. Ms. O'Hagan noted that Plaintiff "has not worked enough hours to apply for FMLA and to date has not applied for 1199 disability." (Ex. 68 to the Hoey Decl., Dkt. Entry No. 46-69.) Mr. Foti replied: "Monitor her time and attendance and let me know [if] she calls out her next scheduled date. Also monitor her punch in and outs and keep me advised of any violations." (*Id.*) Ms. O'Hagan responded to Mr. Foti on July 11, 2011, informing him that Plaintiff had reported to work as scheduled on July 5, 6, and 8, but had called out sick on July 9 and 10. (*Id.*) Shortly thereafter, on July 15, 2011, Plaintiff formally was discharged by a disciplinary notice signed by Ms. O'Hagan. The notice cited Plaintiff's two recent sick days as the reason for her termination, and included as an additional infraction Plaintiff's failure to "swipe out" when leaving work on June 28, 2011. (Ex. 8 to the Hoey Decl., Dkt. Entry No. 46-9.)

## VI.     Events Following Plaintiff's Termination

On July 27, 2011, a grievance hearing was held regarding Plaintiff's termination. The hearing was attended by Plaintiff, Ms. O'Hagan, and Mr. Foti, as well as Ms. Johnson and other union representatives. At the hearing, Plaintiff was offered the opportunity to resign her employment and coordinate with her union to obtain disability benefits. (*See, e.g.*, Ex. 3 to the Hoey Decl., Dep. Tr. of Joseph Foti ("Foti Dep.") at 338:3-339:15, Dkt. Entry No. 46-4.) According to Ms. Johnson and Ms. O'Hagan, Plaintiff initially agreed to this arrangement. (Johnson Dep. at 95:18-97:2; Ex. 2 to the Hoey Decl., Dep. Tr. of Betty O'Hagan ("O'Hagan Dep.") at 222:23-223:2, Dkt. Entry No. 46-3.) Plaintiff denies that she ever did. (Francis Dep. at 82:5-12; Francis Decl. ¶¶ 20-21.) Rather, Plaintiff alleges that she told Ms. O'Hagan and Mr. Foti that, although she had been sick due to her cancer, she wanted to continue working and physically was able to do so. (Francis Dep. at 270:4-15; Francis Decl. ¶ 20.) In response, Ms.

O'Hagan allegedly told Plaintiff that she was "seriously ill" and needed to "go on permanent government disability benefits." (Francis Dep. at 270:4-6; Francis Decl. ¶ 20; Johnson Dep. at 97:5-8.) Ms. O'Hagan denies making that statement. (O'Hagan Dep. at 224:14-20; *see also* Foti Dep. at 341:11-15.)

Whatever the case may be, it is undisputed that Plaintiff ultimately refused to sign a settlement agreement memorializing the arrangement whereby she voluntarily would resign her employment. (Def.s' 56.1 ¶ 215; Pl.'s 56.1 Resp. ¶ 215.) On August 3, 2011, while a determination on Plaintiff's grievance was still pending, Dr. Bharel wrote a note on behalf of Plaintiff, stating that she was "in good physical health" and "fit to do any job without any restrictions." (Ex. 70 to the Hoey Decl., Dkt. Entry N. 46-71.) One day later, Mr. Foti issued a determination denying Plaintiff's grievance and upholding her termination. (Ex. 72 to the Hoey Decl., Dkt. Entry No. 46-73.) According to the determination, Plaintiff admitted to time and attendance violations at the grievance hearing. (*Id.*)

## STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations omitted). A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" when "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Id.* To determine whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam) and *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989)). "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The moving party bears the burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrates the absence of a genuine issue of fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted). The nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in [its] favor." *Anderson*, 477 U.S. at 256. The nonmoving party may not "rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the nonmoving party's pleading." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532-33 (2d Cir. 1993) (citations and internal quotations omitted). "Summary judgment is appropriate only '[w]here the record taken as a whole could

not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita*, 475 U.S. at 587).

## DISCUSSION

### I. Plaintiff's ADA Claims

The ADA, as amended by the ADA Amendment Act of 2008 (the "ADAAA"), Pub.L. No. 110-325 (2008), prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Proscribed acts under the statute include discriminatory discharge as well as failing to make reasonable accommodation for the known physical limitations of an otherwise qualified individual with a disability, unless such accommodation would impose an undue hardship on the employer. *Id.*; *see also* 42 U.S.C. § 12112(b)(5)(A).

Claims alleging disability discrimination and failure to accommodate in violation of the ADA are analyzed using the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *See McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (citing *McBride v. BIC Consumer Prods. Mfg. Co. Inc.*, 583 F.3d 92, 96 (2d Cir. 2009)); *see also Snowden v. Trustees of Columbia Univ.*, 612 F. App'x 7, 8 (2d Cir. 2015). Under that framework, the plaintiff bears the initial burden to establish a *prima facie* case of disability discrimination. *Sista v. CDC Ixis North Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006); *Heyman v. Queens Village Comm. for Mental Health for Jamaica Comm. Adolescent Prog., Inc.*, 198 F.3d 68, 72 (2d Cir. 1999). If the plaintiff can satisfy that burden, which is not a demanding one, *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998), the onus shifts to the defendant to offer through the introduction of admissible evidence a legitimate, non-discriminatory reason for the employment action at issue. *Sista*, 445 F.3d at 169.

Assuming the defendant does so, the burden reverts to the plaintiff to demonstrate that the employer's proffered reason is pretext for a discriminatory motive. *Id.* The plaintiff may satisfy this burden either through "the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case." *Heyman*, 198 F.3d at 72.

While the intermediary evidentiary burdens shift back and forth under the *McDonnell Douglas* framework, the ultimate burden of "persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."[7] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (internal quotation marks and citation omitted). Furthermore, "[i]n discrimination claims based both on adverse employment actions and on failures to accommodate, the plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [her] to perform the essential functions of [her] employment." *McMillan*, 711 F.3d at 126 (quoting *McBride*, 583 F.3d at 97) (internal quotation marks omitted).

## A. Discriminatory Discharge

To establish a *prima facie* case of discrimination under the ADA , a plaintiff must show by a preponderance of the evidence that: "(1) [her] employer is subject to the ADA; (2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [s]he

---

[7] There is an open question in this Circuit as to whether a plaintiff alleging discrimination under the ADA must show: (1) that his or her disability was the "but-for" cause of the employment action at issue, consistent with the causation standard applicable to claims for retaliation under Title VII of the Civil Rights Act of 1964, *see Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013), and claims under the Age Discrimination in Employment Act, *see Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009); or (2) that his or her disability was at least one "motivating factor" in the employer's decision, consistent with the causation standard applicable to claims for discrimination under Title VII, *see Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72 (2d Cir. 2015). *See Maitland v. Konica Minolta Bus. Solutions U.S.A., Inc.*, 2016 WL 304884, at *5 (E.D.N.Y. Jan. 25, 2016); *DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 175-76 (D. Conn. 2015); *Sherman v. County of Suffolk*, 71 F. Supp. 3d 332, 348 (E.D.N.Y. 2014).

suffered adverse employment action because of [her] disability." *Sista*, 445 F.3d at 169 (quoting *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001). Here, the Court addresses only the second and third elements of Plaintiff's *prima facie* case, as it is undisputed that Wyckoff is subject to the ADA and that Plaintiff suffered an adverse employment action when she was terminated.

### 1.    Whether Plaintiff Was "Disabled"

While Defendants argue at length that they were not *aware* of Plaintiff's disability, they do not seriously dispute that she suffered from a disability. Moreover, there is ample evidence in the record to support a reasonable conclusion that Plaintiff, in fact, was "disabled" within the meaning of the ADA. The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of having such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Notably, major life activities include the "operation of a major bodily function," including the function of the lymphatic system. 29 C.F.R. § 1630.2(i)(1)(ii). Other major life activities specified by the ADA include sleeping, lifting, concentrating, and performing manual tasks like grasping, all of which Plaintiff allegedly is restricted from doing when her lymphedema is active. *See* 42 U.S.C. § 12102(2)(A); (*see also* Francis Decl. ¶ 5.)

Furthermore, to certify her need for medical leave, Plaintiff submitted physicians' notes to Wyckoff that identified her diagnosis as lymphedema either explicitly by name, (*see* Ex. 32 to the Hoey Decl.), or by describing common symptoms of lymphedema such as edema. *See, e.g.*, Ex. 46 to the Hoey Decl., Dkt. Entry No. 46-47; Ex. 44 to the Freyre Decl.) In 2003, Plaintiff also submitted a note from her general practitioner explaining that she was unable to lift or push heavy objects. (Ex. 21 to the Freyre Decl., Dkt. Entry No. 47-23.) While that recommendation

could have been based on Plaintiff's general need to avoid physical strain after her surgery, Plaintiff's oncologist submitted a similar note in 2006 recommending that she be excused from "strenuous activities at her work place" due to her "underlined [*sic*] condition." (Ex. 47 to the Freyre Decl, Dkt. Entry No. 47-49.) From this evidence, as well as other evidence in the record, a reasonable juror could conclude that Plaintiff was disabled within the meaning of the ADA.

In addition, there is evidence in the record to support a reasonable conclusion that Defendants regarded Plaintiff as having a disability, which also comes within the meaning of a "disability" under the ADA. 42 U.S.C. § 12102(1)(C). To cite just one example, Plaintiff testified that Ms. O'Hagan told her she needed to go on permanent disability assistance, an allegation at least somewhat corroborated by Ms. Johnson's testimony. (*See* Francis Dep. at 270:4-6; Francis Decl. 20; Johnson Dep. at 97:5-8.) Finally, the Court notes that even though Plaintiff's lymphedema allegedly flared up intermittently, that does not disqualify it from protection as a disability under the ADA. *See* 42 U.S.C. § 12102(4)(D) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.") In sum, Plaintiff has made a showing of disability sufficient to establish the second element of her *prima facie* case.

### 2. Whether Plaintiff Was "Otherwise Qualified"

The remaining element of Plaintiff's *prima facie* case is the requirement to show that she was "otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation." *Sista*, 445 F.3d at 169 (quoting *Giordano*, 274 F.3d at 747.) Defendants contend that Plaintiff cannot demonstrate such qualification, given the extensive and well documented record of her absenteeism. Before reaching that question, the Court first considers whether regular and predictable attendance, in fact, was an essential function of

Plaintiff's job. The Court begins from the proposition that regular attendance at work is "an essential requirement of virtually all employment." *Vandenbroek v. PSEG Power, CT LLC*, 356 F. App'x 457, 460 (2d Cir. 2009); *Rios v. Dep't of Educ.*, 351 F. App'x 503, 505 (2d Cir. 2009); *Lewis v. New York City Police Dep't*, 908 F. Supp. 2d 313, 327-28 (E.D.N.Y. 2012), *aff'd* 537 F. App'x 11 (2d Cir. 2013); *see also Ramirez v. New York City Bd. of Educ.*, 481 F. Supp. 2d 209, 221-222 (E.D.N.Y. 2007) (collecting authority); *Stephens v. Potter*, 2009 WL 2346771, at *4 (D. Conn. July 29, 2009) (same). While common sense similarly dictates that being present at work is essential in most cases, such truisms do not substitute for the "penetrating factual analysis" a court must conduct in each case to discern the essential functions of a particular job. *See McMillan*, 711 F.3d at 126. Here, such an analysis yields the conclusion that regular and predictable attendance was an essential function of Plaintiff's job as an EDT.

As an initial matter, the Court must give considerable deference to what functions Wyckoff deemed essential to Plaintiff's job, particularly in light of Wyckoff's obligation to ensure the "responsible provision of patient care in a hospital setting." *Davis v. New York City Health and Hosps. Corp.*, 508 F. App'x 26, 29 (2d Cir. 2013); *see also McMillan*, 711 F.3d at 126. The record is replete with evidence that Wyckoff considered regular and predictable attendance to be essential to Plaintiff's job. For example, Plaintiff's numerous employee reviews were recorded on an evaluation form that listed the specific "duties and responsibilities" of a nurse technician, among which was "report[ing] to work on time and as scheduled." (*See, e.g.*, Exs. 29, 30, 37, 40 to the Hoey Decl.) Wyckoff's Time and Attendance Policies, as well as Wyckoff's employee handbook, similarly required Hospital employees to show up for work on time and as scheduled.[8] (*See* Exs. 16, 17, and 18 to the Hoey Decl.) In fact, at her deposition,

---

[8] In addition, Wyckoff's Labor Relations Manager, Mr. Foti, provided a declaration attesting that Wyckoff considered "steady, regular attendance" to be "essential to [Plaintiff's] position as an Emergency Department

Plaintiff even agreed that she was expected to be at work on time and remain there for the duration of her shift. (Francis Dep. at 47:2-48-4.) Finally, whether by verbal warning, written warning, or suspension, Defendants repeatedly disciplined Plaintiff for her "unacceptable attendance" before ultimately terminating her for absenteeism. (*See, e.g.*, Exs. 8, 9, 30, 33, 34, 35, 38, 41, 52 to the Hoey Decl.)

The conclusion that regular and predictable attendance was essential to Plaintiff's job is further supported by the very nature of her position, which entailed "providing basic care to patients, tracking and recording patients' vital signs, and assisting doctors and nurses with procedures." (Francis Decl. ¶ 2.) There is no evidence to suggest that Plaintiff reasonably could perform such duties remotely from home, or at any time other than her scheduled shift. *See Ramirez*, 481 F. Supp. 221-22. Moreover, Plaintiff does not dispute that EDTs played a "vital role" in the Hospital's response when a patient needed emergency medical care, a common occurrence in Wyckoff's emergency department because it regularly received patients suffering from heart attacks, strokes, gunshot wounds, and other deadly injuries. (Francis Dep. at 61:6-62:8.) Therefore, more than just ensuring orderly workplace function, regular and predictable attendance was essential because it was crucial to patient safety.[9]

Plaintiff nevertheless argues that Wyckoff did not consider regular attendance an essential function because it tolerated her own absences, as well as the "glaring" attendance

Technician." (Reply Declaration of Joseph Foti, dated Feb. 20, 2015 ("Foti Reply Decl.") ¶¶ 2-3, Dkt. Entry No. 48-16.)

[9] Indeed, courts in this Circuit and in others consistently have recognized the particular need for healthcare professionals in a hospital setting to attend work on time and as scheduled. *See, e.g., Guice-Mills v. Derwinski*, 772 F.Supp. 188, 198-99 (S.D.N.Y. 1991), *aff'd* 967 F.2d 794 (2d Cir. 1992) (being at work on time an essential function of head nurse position); *see also Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1238 (9th Cir. 2012) ("regular on-site presence necessary" for neo-natal nurse, given the at-risk patient population that could be affected by unscheduled absences); *Rask v. Fresenius Med. Care N. Am.*, 509 F.3d 466, 469-470 (8th Cir. 2007) (unscheduled absences rendered patient care technician not qualified to perform essential functions of job); *Amato v. St. Luke's Episcopal Hosp.*, 987 F. Supp. 523, 530 (S.D. Tex. 1997) (regular attendance an essential function of nursing assistant's job).

problems of two other employees mentioned by Ms. O'Hagan in her deposition testimony. (*See* Pl.'s Opp'n at 18; *see also* O'Hagan Dep. at 170:10-171:25.) While a court may consider the experiences of incumbents in the same or similar jobs when ascertaining the essential functions of a position*, see Stone v. City of Mt. Vernon*, 118 F.3d 92, 97 (2d Cir. 1997) (citing 29 C.F.R. § 1630.2(n)), Plaintiff's argument is belied by her own disciplinary record. Plaintiff repeatedly was disciplined for unacceptable attendance beginning in 2003, and the mere fact that she was not finally terminated for absenteeism until 2011 is woefully insufficient to demonstrate that Wyckoff did not consider regular attendance to be essential. Furthermore, the two other employees noted by Ms. O'Hagan as having glaring attendance problems were, in fact, terminated by Wyckoff.[10] (*See* O'Hagan Dep. at 171:8-10; *see also* Ex. A to the Foti Reply Decl., Dkt. Entry No. 48-17.)

Consistent with the foregoing, the Court has little difficulty concluding that regular and predictable attendance was essential to Plaintiff's job. Given the overwhelming evidence of Plaintiff's persistent, recurring, and un-remedied absenteeism between 2003 and 2011, the record is clear that Plaintiff was unable to perform that essential job function. *See Rios*, 351 F. App'x 505; *Lewis*, 908 F. Supp. 2d at 327-28 (plaintiff not "otherwise qualified" because she could not perform essential function of "regularly showing up to work."); *Vandenbroek*, 356 F. App'x at 460; *Lewis*, 908 F. Supp. 2d at 327-28. Plaintiff's union delegate testified that she was not aware of any other EDTs who were absent as frequently as Plaintiff, (*see* Johnson Dep. at 142:7-14), while Plaintiff even admitted at her deposition that she ordinarily called out sick between one

---

[10] Plaintiff further argues that another nurse technician in the emergency department had 33 documented instances of lateness on her record, but was not terminated by Wyckoff. (Pl.'s Opp'n at 18.) However, the record reflects that the employee in question, although not fired, was progressively disciplined. (Ex. 57 to the Freyre Decl., Dkt. Entry No. 47-59.) Moreover, Ms. O'Hagan testified that this employee's instances of lateness, most of which involved arriving to work no more than 15 minutes late, (*see* Ex. 13 to the Reply Declaration of Barbara E. Hoey, dated Feb. 20, 2015 ("Hoey Reply Decl."), Dkt. Entry No. 48-15), were not comparable in seriousness to Plaintiff's unscheduled absences. (O'Hagan Dep. at 237:20-238:18.)

and ten times per month. (Francis Dep. at 69:2-7.) In fact, given her record of absenteeism, Plaintiff was subject to discipline under Wyckoff's Attendance Policy for two or more unscheduled absences in a single month, even if those absences were due to sick calls. (*See* Exs. 16 and 17 to the Hoey Decl.; *see also* Pl.'s 56.1 ¶¶ 60-61; Def.s' 56.1 Resp. ¶¶ 60-61.) Plaintiff cannot dispute that she repeatedly exceeded that limit. (*See, e.g.*, Exs. 9, 31 (24 unscheduled absences in eight months), 33, 38 (75 unscheduled absences due to sick calls in less than a year), 52 (10 absences in 3 months), 61, 68.) Accordingly, to establish that she was "otherwise qualified" for purposes of her *prima facie* case, Plaintiff must show that she could achieve regular and predictable attendance at work with the benefit of some identified reasonable accommodation. *See McMillan*, 711 F.3d at 127.

### a. Whether, With Reasonable Accommodation, Plaintiff Could Attend Work

The burden to demonstrate a reasonable accommodation is not a heavy one, requiring only that the plaintiff "suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Id.* (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)). Under the ADA, reasonable accommodations may include, *inter alia*, "job restructuring, part-time or modified work schedules, [or] acquisition or modification of equipment or devices." 45 C.F.R. § 84.12(b). However, it is beyond dispute that "[a] reasonable accommodation can never involve the elimination of an essential function of a job." *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003).

Here, Plaintiff proposes that Wyckoff should have allowed her to take "increased sick days" in excess of what was permissible under Hospital policy. (*See* Pl.'s Opp'n at 1, 17-20.) Plaintiff contends that Wyckoff actually accommodated her disability in this manner for several years, tolerating her need for frequent unscheduled absences until Ms. O'Hagan became Director

and allegedly refused to continue doing so. (*See Id.* at 1, 5-6, 15.) However, under the ADA, a reasonable accommodation is one that *enables* a disabled employee to perform the essential functions of a job. *See Davis*, 508 F. App'x at 29 (the ADA "affords a right to such reasonable accommodations as will allow the disabled individual to perform [essential] functions.") By contrast, Plaintiff's request for as many sick days as needed would excuse her from the essential function of regular and predictable attendance. The law in this Circuit categorically holds that such an accommodation, which would eliminate an essential job function, is not reasonable. *See Shannon*, 332 F.3d at 100; *see also Davis*, 508 F. App'x at 29.

Notably, Plaintiff does not suggest that the additional sick days she requests would be capped at any particular number, or conditioned on giving advance notice of an absence to Wyckoff. The fact that Plaintiff declines to make such assurances is understandable, as her claimed disability is chronic in nature and she presumably has no way of knowing when or how often it will render her incapable of working. However, that fact underscores the unreasonableness of Plaintiff's proposed accommodation, which essentially would let Plaintiff set her own work schedule according to personal needs, rather than those of her employer. Any such accommodation is not reasonable as a matter of law.[11]

This would hold true even if the Court were to find that Plaintiff's claimed disability caused all of her absences, although it bears emphasis that the evidence in the record would not

---

[11] *See Lewis*, 908 F. Supp. 2d at 327; *Reddick v. Niagara Mohawk Power Co.*, 2010 WL 5185098, at *6 (N.D.N.Y. Dec. 16, 2010) (requests to tolerate "absences [that] are sporadic and unpredictable . . . may be deemed unreasonable as a matter of law."); *Mescall v. Marra*, 49 F. Supp. 2d 365, 375 (S.D.N.Y. 1999) (proposed accommodation of not counting sick days towards employee attendance record "unreasonable as a matter of law"); *Aquinas v. Fed. Express Corp.*, 940 F. Supp. 73, 79 (S.D.N.Y. 1996) ("permission to work only when . . . illness permits" is an unreasonable accommodation); *see also Carr v. Reno*, 23 F.3d 525, 531 (D.C. Cir. 1994) ("[T]o require an employer to accept an open-ended 'work when able' schedule for a time-sensitive job would stretch 'reasonable accommodation' to absurd proportions and imperil the effectiveness of the employer's public enterprise.")

support such a finding.[12]  As other courts in this Circuit have recognized, "[t]he ADA does not require employers to tolerate chronic absenteeism even when attendance problems are caused by an employee's disability." *Lewis*, 908 F. Supp. 2d at 327 (quoting *Mescall*, 49 F. Supp. 2d at 374 n.18); *see also Reddick*, 2010 WL 5185098, at *6 (employer not required under ADA to accommodate excessive absenteeism "even where the absences are due to a disability"); *Aquinas*, 940 F. Supp. at 79.  In *Samper v. Providence St. Vincent Medical Center,* a case involving facts analogous to those here, the plaintiff similarly argued that she should have been permitted an unspecified number of unscheduled absences from her nursing shift at a hospital. The Ninth Circuit rejected that accommodation as patently unreasonable, stating: "An accommodation that would allow [a plaintiff] to simply . . . miss work whenever she felt she needed to and apparently for so long as she felt she needed to [a]s a matter of law . . . [is] not reasonable on its face."  *Samper*, 675 F.3d at 1240 (internal quotation marks and citation omitted).  Plaintiff's suggested accommodation similarly must be rejected as unreasonable on its face.

Plaintiff nevertheless contends that her proposed accommodation is reasonable because Wyckoff cannot show that implementing it would cause undue hardship in the form of "significant difficulty or expense." (*See* Pl.'s Opp'n at 19-20) (citing 42 U.S.C. § 12111(10)(A)). In support of this argument, Plaintiff submits a forensic analysis of timesheets for a period spanning nearly two years.[13]  *See* Steinkamp Decl.  The analysis purports to show that Wyckoff

---

[12]   For example, there is no evidence in the record that Plaintiff provided Wyckoff with a physician's note confirming her illness for every day she called out sick.  Furthermore, in testifying at his deposition regarding patient records he maintained for Plaintiff, Dr. Bharel described instances where Plaintiff's medical complaints either were unrelated to her 2002 cancer surgery in his medical judgment, or could not be confirmed definitively as related or unrelated.  (*See* Bharel Dep. at 46:4-53:17.)  In fact, Dr. Bharel testified that he sometimes wrote a physician's note for Plaintiff based only on her description of symptoms over the telephone, without actually examining her.  (*Id.* at 61:10-16.)

[13]   As addressed in Section III of this Opinion, *infra*, Defendants seek to strike the Steinkamp Declaration and any

only had to pay overtime on 19 occasions when Plaintiff called out sick during that period. (*Id.*) Karen Florio ("Ms. Florio"), a supervisor at Wyckoff, explained at her deposition that overtime pay could be avoided when an EDT called out sick if a nurse technician could be pulled in from another department that was overstaffed, or if part-time or *per diem* workers were available to work on short notice. (*See* Ex. 4 to the Freyre Decl., Dep. Tr. of Karen Florio ("Florio Dep.") at 29:15-38:24, Dkt. Entry No. 47-3.) In addition to the allegedly minimal cost implications, Plaintiff also argues that her unscheduled absences never caused any specific, tangible harm to a patient. (*See* Pl.'s Opp'n at 20.)

Even affording Plaintiff all reasonable inferences, her argument fails because it fundamentally distorts the "reasonable accommodation" analysis under the ADA. It is not an employer's burden to show that a proposed accommodation would be unduly difficult or expensive where, as here, that accommodation would eliminate the essential functions of a job. By way of example, if a postal worker were unable to lift boxes due to a disability, there would be no expense to the employer in requiring a co-worker on the same shift to lift the boxes instead. Such accommodation nevertheless would be unreasonable, assuming that lifting boxes was an essential job function for a postal worker, because it would eliminate that function and allocate two employees to do the job of one. *See Gilbert v. Frank*, 949 F.2d 637, 644 (2d Cir. 1991). In this instance, Plaintiff's proposed accommodation is even more unreasonable because it would require other employees, acting in her stead, to perform every function of her job on an unpredictable basis and for an indefinite number of shifts.

The plaintiff in *Samper* made essentially the same argument as Plaintiff, reasoning that the hospital where she worked demonstrably was capable of providing coverage for her nursing shift whenever she called out sick. *See Samper*, 675 F.3d at 1240. The Ninth Circuit

---

argument based thereupon.

nevertheless held that permitting the plaintiff as many sick days as she needed was not reasonable as a matter of law, as such accommodation "ignore[d] recognition of employer needs" and would "gut reasonable attendance policies." *Id.* Here, Plaintiff's unscheduled absences similarly left Wyckoff in the position of having to make last-minute arrangements to cover her shift on a recurring and unpredictable basis. Even if that did not entail significant expense or tangible harm to patients, it unreasonably interfered with Wyckoff's needs as an employer, and its right to set and enforce policies it deemed necessary to ensure the responsible provision of patient care. As such, irrespective of its cost implications, Plaintiff's proposed accommodation of "increased sick days" is not reasonable under the ADA.

Albeit in perfunctory fashion, Plaintiff alternatively argues that she requested, but was denied, an assignment to "light duty."[14] (*See* Pl.'s Opp'n at 20.) Whether that accommodation would have enabled Plaintiff to achieve regular and predictable attendance is disputed by the parties. However, the Court need not reach that question, as the record firmly establishes that a light duty assignment would eliminate essential functions of Plaintiff's job. While Plaintiff does not sufficiently describe what "light duty" would entail, she suggests that she needed to be excused from strenuous workplace tasks such as pushing heavy stretchers and lifting patients. (*See, e.g.*, Pl.'s Opp'n at 1.)

However, Plaintiff's job description clearly stated that, among other "physical demands," her position required "lifting, pulling, [and] pushing," "frequently lift[ing] patients/objects from 10 lbs to 150 lbs," "frequently push[ing] objects up to 200 pounds," "occasionally lift[ing], with assistance, objects greater than 150 lbs," and "occasionally

---

[14] While the record suggests that Plaintiff never expressly asked for a light duty assignment, she contends that she requested such accommodation by submitting a physician's note in 2003, and again in 2006, stating that she could not perform strenuous physical activity. (*See* Def.s' 56.1 ¶ 130; Pl.'s 56.1 Resp. ¶ 130; *see also* Francis Decl. ¶¶ 9-10; Francis Dep. at 225:6-19.) This issue is discussed in Section I.B, *infra*, which addresses Plaintiff's ADA claim for failure to accommodate.

carr[ying] objects weighing up to 50 lbs." (*See* Exs. 29, 30, 37, and 40 to the Hoey Decl.) At her deposition, Ms. O'Hagan similarly testified that Plaintiff's position was a "heavy job," a lot of which "involve[d] pushing and lifting." (O'Hagan Dep. at 60:16-61:2.) According to Ms. O'Hagan, an EDT also needed to be able to physically intervene if a patient attempted to hurt him or herself, or tried to run away. (*Id.* at 61:12-19.) In fact, Plaintiff admits that her alleged lymphedema symptoms "prevent[ed] her from pushing stretchers and wheelchairs or lifting patients, *both of which were part of her job responsibilities*." (Pl.'s Opp'n at 1) (emphasis added.) Accordingly, there is no genuine issue of fact that heavy lifting and pushing were essential functions of an EDT. To the extent a light duty assignment would eliminate those essential functions, it does not constitute a reasonable accommodation under the ADA. *See Shannon*, 332 F.3d at 100; *see also Davis*, 508 F. App'x at 29 (proposed accommodation that would excuse nurse from essential patient care duties, including "lifting a patient" and "pushing a wheelchair or stretcher," was not reasonable.)

It is also possible, through far from clear in her papers, that by "light duty" Plaintiff means she should have been reassigned to a different rotation within the emergency department, which would entail a separate, less physically demanding set of essential functions she was capable of performing.[15] While reassignment to a vacant, existing position may constitute a reasonable accommodation under the ADA, the Second Circuit has held that an employer is not required to create an altogether new position for a disabled employee. *See Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 187 (2d Cir. 2006); *see also Palmieri v. City of Hartford*, 947 F.

---

[15] To the extent Plaintiff means she should have been transferred to a position outside the emergency department, in a capacity entirely different from an EDT, she does not present any evidence to suggest an existing, vacant position to which she could have been reassigned. *See Thompson v. New York City Dep't of Probation*, 348 F. App'x 643, 645 (2d Cir. 2009) ("An ADA plaintiff seeking accommodation in the form of a transfer bears the burden of proving that a vacancy existed into which he or she might have been transferred.") (citing *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000)).

Supp. 2d 187, 203-04 (D. Conn. 2013). Here, the only evidence to substantiate the existence of a light duty rotation for an EDT is the brief and somewhat vague deposition testimony of Ginette Brouard ("Ms. Brouard"), a nurse at Wyckoff who formerly worked with Plaintiff. She recalled that "three nurses and two techs" were given "light duty" while pregnant, by which she meant they were "assigned triage, outside triage, rather than in the holding area or the front ER." (*See* Ex. 10 to the Hoey Reply Decl., Dep. Tr. of Ginette Brouard ("Brouard Dep.") at 109:4-25, Dkt Entry No. 48-12.) Ms. Brouard did not recall the names of those employees and there is no evidence in the record to indicate when this occurred. (*See Id.*)

On the other hand, Ms. O'Hagan testified that she was not aware of any instance in which any EDT was placed on light duty. (O'Hagan Dep. at 62:3-7.) In his declaration, Mr. Foti similarly attested that there is no light duty assignment available to an EDT, as all employees in the emergency department needed to be cleared for full duty. (Foti Reply Decl. ¶ 10.) When Ms. Florio was asked at her deposition whether nurse technicians could be assigned to light duty, she responded unequivocally, "No, the person has to be full duty in nursing." (Florio Dep. at 134:5-9.) In fact, in 2011, Ms. Brouard was denied an assignment to light duty that she requested due to pregnancy. In a letter informing Ms. Brouard of the denial, Ms. O'Hagan stated: "Please be advised that there is no light duty or modified assignments [in the emergency room] as per Human Resources . . . . You will need to be cleared for full duty or submit leave of absence documentation." (Ex. 9 to the Hoey Reply Decl., Dkt. Entry No. 48-11.)

In light of the foregoing, Plaintiff fails to make a sufficient showing that a light duty rotation was available to her at the time of her termination in 2011.[16] *See McBride*, 583 F.3d at

---

[16] Even if a *temporary* assignment to light duty existed, as Mr. Brouard suggested, Plaintiff does not explain how such an assignment would allow her to achieve regular and predictable attendance on a long-term basis. *Cf. Palmieri*, 947 F. Supp. 2d at 202-03 (temporary assignment to light duty did not obligate employer to offer light duty position on a permanent basis, where plaintiff could not perform essential functions of a patrol officer.)

97-98 ("An ADA plaintiff does not satisfy her burden to identify a potential accommodation merely by reciting the formula that her employer could have reassigned her. Instead, she must demonstrate the existence, at or around the time when accommodation was sought, of an existing vacant position to which she could have been reassigned."); *Palmieri*, 947 F. Supp. 2d at 205 ("[I]t is the plaintiff that bears the burden of proving that an accommodation exists that permits him to perform the job's essential functions.") (citing *Jackan*, 205 F.3d at 566). Furthermore, as previously noted, the ADA did not require Wyckoff to create a new light duty rotation specifically to accommodate Plaintiff's claimed disability. *See Graves*, 457 F.3d at 187. In light of Plaintiff's failure to identify a reasonable accommodation that would allow her to achieve regular and predictable attendance at work, she has not demonstrated that she was "otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation." *Sista*, 445 F.3d at 169 (quoting *Giordano*, 274 F.3d at 747).

This conclusion is compelled even though Plaintiff was a capable worker by most accounts, aside from her poor attendance and punctuality. As Ms. Ignacio states in her declaration: "When Ms. Francis was at work, she always performed her job well and did the tasks assigned to her. However, Ms. Francis had problems with attendance and frequently called out sick." (Ignacio Decl. ¶¶ 4-5.) Given her record of absenteeism, Plaintiff cannot establish that she was "otherwise qualified" through evidence that she was a capable EDT on those occasions when she did show up for work. *See Vandenbroek*, 356 F. App'x at 460. The ADA does not require an employer to retain an employee, no matter how capable, if he or she "fails to attend work on a regular basis." *Ramirez*, 481 F. Supp. 2d at 221 (citing *Bobrowsky v. New York City Bd. of Educ.*, 1999 WL 737919, at *4, 13 (E.D.N.Y. Sept. 16, 1999). Given Plaintiff's failure to demonstrate that she was "otherwise qualified," she has not established a *prima facie*

case of disability discrimination under the ADA. Accordingly, Defendants are entitled to summary judgment dismissing Plaintiff's ADA discrimination claim.

### B. Failure to Accommodate

To establish a *prima facie* case for failure to accommodate under the ADA, a plaintiff must show by a preponderance of the evidence that: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations. *McMillan*, 711 F.3d at 125-26 (quoting *McBride*, 583 F.3d at 97).

The Court first examines the alleged conduct underlying Plaintiff's failure to accommodate claim. In 2003, Plaintiff submitted a note to Wyckoff from her general practitioner stating that she should not lift or push heavy objects. (Ex. 21 to the Freyre Decl.) Similarly, in 2006, Plaintiff submitted a note from her oncologist requesting that she be excused from "any strenuous activities at her work place." (Ex. 47 to the Freyre Decl.) Plaintiff alleges that, in response to both letters, Wyckoff told her that she would not be allowed to work with the requested restrictions. (*See* Pl.'s 56.1 ¶ 29; Def.s' 56.1 Resp. ¶ 29.) Wyckoff disputes Plaintiff's account, noting that she admitted during her deposition that she never requested any accommodation. In fact, in response to a series of questions at her deposition, Plaintiff testified that she did not tell anyone that she needed an accommodation, a special or part-time schedule, or a light duty assignment. (Francis Dep. at 225:6-19.)

That parties' disagreement as to whether the above letters constituted requests for accommodation largely is immaterial. Even assuming that they did, any claim under the ADA premised upon Wyckoff's denial of such requests in approximately 2003 and 2006 clearly would

be time-barred. A plaintiff in New York must file a charge with the EEOC within 300 days of the defendant's allegedly unlawful employment act before pursuing an ADA claim in federal court. 42 U.S.C. § 12117(a) (adopting the procedural filing requirements of 42 U.S.C. § 2000e-5); *see also Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999). Notably, an employer's denial of a requested accommodation does not give rise to a "continuing violation," but is a discrete employment action that requires the plaintiff to file a charge with the EEOC within 300 days of the denial. *See Kane v. Carmel Cent. Sch. Dist.*, 2014 WL 7389438, at \*12-13 (S.D.N.Y. Dec. 15, 2014); *see Ugactz v. United Parcel Serv., Inc.*, 2013 WL 1232355, at \*5 (E.D.N.Y. Mar. 26, 2013) (citing *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 134-35 (2d Cir. 2003)). Here, Plaintiff filed a charge with the EEOC on May 9, 2012, (*see* Ex. 26 to the Hoey Decl., Dkt. Entry No. 46-27), rendering untimely any claim premised upon Wyckoff's failure to accommodate Plaintiff's disability in 2003 or 2006.

Accordingly, though it could have been alleged with more clarity, Plaintiff's failure to accommodate claim seems to be premised upon: (1) Ms. O'Hagan's purported refusal when she became Director to continue allowing Plaintiff to take as many sick days as she needed; and/or (2) Wyckoff's failure to engage in an "interactive process" with Plaintiff to assess whether her claimed disability could be accommodated in some manner.[17] (*See* Pl.'s Opp'n at 14-15.) In either case, Plaintiff's claim fails. Similar to a claim for discrimination under the ADA, a plaintiff alleging an employer's failure to accommodate must demonstrate for purposes of her *prima facie* case that, "with reasonable accommodation, [she] could perform the essential functions of [her] job." *McMillan*, 711 F.3d at 125-26 (quoting *McBride*, 583 F.3d at 97). This

---

[17] The parties sharply dispute whether Plaintiff's claimed disability was obvious or otherwise known to Wyckoff, such that Wyckoff was obligated to engage in an interactive process, even if Plaintiff did not expressly request an accommodation. *See Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134-36 (2d Cir. 2008). However, the Court need not reach that issue and declines to do so.

burden applies even where, as here, a plaintiff's failure to accommodate claim is based on allegations that the employer did not engage in the interactive process contemplated by the ADA. As the Second Circuit has explained: "[A]n employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA and evidence thereof does not allow a plaintiff to avoid summary judgment unless she also establishes that, at least with the aid of some identified accommodation, she was qualified for the position at issue." *McBride*, 583 F.3d at 101; *see also Tillman v. Verizon New York, Inc.*, 118 F. Supp. 3d 515, 538-39 (E.D.N.Y. 2015).

For the reasons already discussed with respect to Plaintiff's ADA discrimination claim, *supra*, Plaintiff has not met her burden to show that, with some reasonable accommodation, she could perform the essential function of regular and predictable attendance at work. As previously noted, an accommodation that would permit Plaintiff an unspecified number of unscheduled absences is not reasonable as a matter of law, while "light duty" either would eliminate essential functions of Plaintiff's job as an EDT, or would entail reassignment to a position that Plaintiff has not supported the existence of with sufficient evidence to create a genuine issue of fact. *See Snowden*, 612 F. App'x at 9-10 (affirming dismissal of ADA claim based on failure to engage in the interactive process because the plaintiff "made no specific showing that a reasonable accommodation was available to her employer.")

Furthermore, while the parties do not acknowledge it, Wyckoff did attempt to accommodate Plaintiff's claimed disability. In addition to the yearlong absence Plaintiff was permitted in order to undergo cancer treatment and recovery in 2002 and 2003, the record reflects that she was granted three additional extended periods of leave in 2006-2007, 2009, and 2010. (*See* Def.s' 56.1 ¶¶ 95, 114, 131; Pl.'s 56.1 Resp. ¶¶ 95, 114, 131.) Although Wyckoff

alleges that it was not properly authorized, Plaintiff also was on leave from work for several months in 2011.  (*See* Def.s' 56.1 ¶¶ 167-69; Pl.'s 56.1 Resp. ¶¶ 167-69.)  Finally, Plaintiff was granted shorter periods of absence when needed, for example when she was excused from work between June 28 and July 5, 2011.  (Ex. 68 to the Hoey Decl.)  Even with the benefit of these numerous periods of leave, Plaintiff was not able to regularly and predictably attend work when she returned to the job.  Having failed to demonstrate that she could perform that essential function of her employment, Plaintiff has not established a *prima facie* case for failure to accommodate under the ADA.  Accordingly, Defendants are entitled to summary judgment dismissing that claim as well.

## II.    Plaintiff's NYSHRL and NYCHRL Claims

As alleged in the Complaint, the only basis for federal subject matter jurisdiction over Plaintiff's NYSHRL and NYCHRL claims is supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).  (*See* Compl. ¶ 4.)   Having dismissed Plaintiff's federal claims under the ADA, the only claims over which it had original jurisdiction, the Court declines to exercise supplemental jurisdiction with respect to Plaintiff's remaining State law claims.  *See Tillman*, 118 F. Supp. 3d at 543 ("[T]he Second Circuit instructs that absent extraordinary circumstances, where federal claims can be disposed of pursuant to [Rule 56 of the Federal Rules of Civil Procedure], courts should abstain from exercising pendent jurisdiction.") (quotation marks and citation omitted); *O'Leary v. Town of Huntington*, 2012 WL 3842567, at *15 (E.D.N.Y. Sept. 5, 2012); *Missick v. City of New York*, 707 F. Supp. 2d 336, 354-55 (E.D.N.Y. 2010).

## III.   Defendants' Motion to Strike

Defendants move to strike the Steinkamp Declaration, and any argument based thereupon, on the ground that Plaintiff did not properly disclose Mr. Steinkamp either as a fact or

expert witness as required by Rule 26 of the Federal Rules of Civil Procedure. (*See* Dkt. Entry No. 43.) Plaintiff opposes, arguing that Mr. Steinkamp did not need to be disclosed because he is a "summary witness" who merely organized information exchanged in discovery for presentation to the Court. (*See* Dkt. Entry No. 45.) As discussed in Section I of this Opinion, *supra*, even if the Court considered the Steinkamp Declaration, it would not alter the conclusion that Defendants are entitled to summary judgment dismissing Plaintiff's claims under the ADA. Given the Court's dismissal of Plaintiff's remaining State law claims on jurisdictional grounds, Defendant's motion to strike is denied as moot.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted to the extent that Plaintiff's claims under the ADA are dismissed with prejudice. In light of the Court's decision to decline to exercise supplemental jurisdiction, Plaintiff's claims under the NYSHRL and NYCHRL are dismissed without prejudice. Finally, Defendants' motion to strike is denied as moot.

SO ORDERED.

Dated: Brooklyn, New York
       March 30, 2016

_____/s/_____
       DORA L. IRIZARRY
       United States District Judge